WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Independence Excavating Incorporated,<br><br>Plaintiff,<br><br>v.<br><br>339 Wilson Street Equipment LLC,<br><br>Defendant. | No. CV-19-08269-PCT-DLR<br><br>**ORDER** |

At issue is Defendant 339 Wilson St. Equipment, LLC's ("Wilson") motion for partial summary judgement (Doc. 25), which is fully briefed (Docs. 26, 27). For the reasons stated below, Wilson's motion is granted.[1]

**I. Background**

Wilson owned a decommissioned paper mill in Flagstaff, Arizona (the "Facility"), which contained industrial equipment and materials (the "Assets"). (Doc. 26 at 1; Doc. 1 at 2.) Wilson and Plaintiff Independence Excavating, Inc. ("Independence") signed a purchase agreement (the "Agreement"), under which Independence was to purchase the Assets and remove them from the Facility. (Doc. 26 at 3.) Wilson estimated that the Assets included approximately 530,000 pounds of stainless steel, 625 tons of steel and cast iron, and 310,000 pounds of copper. (*Id.*) Under the Agreement, Independence agreed to remove the Assets from the Facility, sell them to third parties, and use the proceeds to cover

---

[1] Oral argument is denied because the issues are adequately briefed and further argument would not aid the Court. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

the costs to remove the Assets (the "Removal Costs"). (Doc. 26 at 4; Doc. 27 at 4.) Independence then would pay to Wilson the net proceeds from selling the Assets as a purchase price for the Assets (the "Purchase Price"). (*Id.*)

Paragraph 4 of the Agreement governs the Purchase Price. (Doc. 1 at 10.) It states that "[Independence] shall pay [Wilson]" the "portion of the sales proceeds which is payable to [Wilson] as part of the Purchase Price" and that "[Independence] shall pay [Wilson] the amount due" after receiving an invoice from Wilson. (*Id.*) The Agreement explains that the Purchase Price "shall be determined on the schedule detailed in Exhibit A," a spreadsheet titled "List of Assets" that is attached and incorporated into the Agreement. (*Id.* at 10, 15.) The List of Assets includes estimates of the quantities of Assets, their values based on contemporaneous market prices, and Independence's Removal Costs. (*Id.* at 15.) Although the formula for calculating the Purchase Price is not explicitly stated in the List of Assets, it can be inferred; the Purchase Price equals the sales price of the Assets minus the Removal Costs. (*Id.*; Doc. 26 at 4; Doc. 27 at 4.) The Agreement projected that the Assets would be sold for $1,118,548. (Doc. 1 at 15.) After covering its projected Removal Costs of $552,400, Independence was projected to pay Wilson a Purchase Price of $566,148.[2] (*Id.*)

Importantly, the Agreement was structured as a sale of the Assets rather than as a services contract for their removal. Paragraph 2 of the Agreement states that Wilson agreed to "transfer all of the Assets by a bill of sale" to Independence. (*Id.* at 10.) Paragraph 6 notes that "[t]itle to the Assets shall transfer from [Wilson] to [Independence]" and that "[Independence] shall be responsible for all risk of loss relating to the Assets at all times[.]" (*Id.*) Paragraph 8 states that, "[e]xcept as may be expressly provided herein, each party shall bear its own costs and expenses[.]" (*Id.* at 11.)

Independence began removing the Assets from the Facility on April 25, 2019. (*Id.* at 4.) However, Independence both removed less material and incurred higher Removal

---

[2] Independence contends that only the quantities of Assets were estimates (Doc. 26 at 10), but this argument is illogical. If the Asset quantities were estimates, it necessarily follows that the cost of removal those Assets, the gross amounts they would sell for, and the net proceeds remaining were likewise estimates.

- 2 -

Costs than expected.[3] (Doc. 27 at 5-6.) To date, Independence has recovered only 52,700 pounds of copper from the Facility, less than 20 percent of the estimated amount. (Doc. 26 at 7.) This is significant because the copper was expected to comprise the bulk of the revenue from selling the Assets.[4] (Doc. 1 at 15; Doc. 26 at 9.) As of September 18, 2019, Independence has received $229,003 from selling the recovered Assets, much less than the estimated $1,118,548. (Doc. 1 at 5, 15.) Independence has incurred Removal Costs of $650,000, more than the estimated $552,400. (*Id.*) The decrease in sales revenue from the Assets and higher than expected Removal Costs has left Independence with more than $420,000 of outstanding Removal Costs. (Doc. 26 at 7.)

Independence demanded that Wilson pay the outstanding Removal Costs and Wilson declined, precipitating this action. In Count I (breach of contract), Independence alleges that Wilson breached the Agreement by refusing to pay the outstanding Removal Costs. (Doc. 1 at 6.) In Count II (breach of the implied covenant of good faith and fair dealing), Independence alleges that Wilson interfered with its ability to remove the Assets from the Facility, failed to address issues that hindered Independence, and refused to let Independence remove certain Assets. (*Id.* at 6-7.) In Count III (unjust enrichment), Independence alleges that Wilson has been unjustly enriched by its refusal to pay the outstanding Removal Costs.[5] (*Id.* at 7.) Wilson has moved for summary judgement on Counts I and III only. (Doc. 25 at 1.)

**II. Legal Standard**

---

[3] The reasons for this are disputed but irrelevant to the issues raised in Wilson's motion for partial summary judgment. Independence alleges that Wilson "interfer[ed] with Independence's ability to remove the Assets from the Facility, fail[ed] to promptly address issues that would allow Independence to remove the Assets quickly and safely, and refus[ed] to let Independence remove certain Assets[.]" (Doc. 1 at 7.) Wilson, in its counterclaim, accuses Independence of "underestimat[ing] its removal costs and . . . mismanag[ing] the project[.]" (Doc. 11 at 12.)

[4] Compounding the issue, the market price for copper scrap declined from $1.83 per pound to $0.29 per pound during this time. (Doc. 25 at 7.)

[5] Wilson filed counterclaims against Independence for breach of contract and breach of the implied covenant of good faith and fair dealing. (Doc. 11 at 14-15.) Wilson alleges that Independence breached the Agreement by failing to remove all the Assets from the Facility. (*Id.*) Wilson also seeks a declaratory judgement stating that it performed all its obligations under the Agreement, Independence breached the Agreement, and Independence abandoned its rights to the remaining Assets. (*Id.* at 15-16.) These counterclaims are not at issue here.

Summary judgment is appropriate when there is no genuine dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.  The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id*. at 324.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation and citation omitted).

**III. Discussion**

    **A. Breach of Contract**

Contract interpretation "is a question of law for the court where the terms of a contract are found to be plain and unambiguous." *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993).  Whether a contract is ambiguous is "a question of law, and the mere fact that parties disagree as to its meaning does not establish an ambiguity." *Id*.

Contract provisions are interpreted "according to their plain and ordinary meaning" to effectuate the parties' intent. *Terrell v. Torres*, 456 P.3d 13, 16 (Ariz. 2020) (quoting

*First Am. Title Ins. Co. v. Johnson Bank*, 372 P.3d 292, 294 (Ariz. 2016)). Courts depart from the plain and ordinary meaning only if "it can be shown that the parties intended a special meaning[.]" *Id.* Courts "consider a provision's meaning in the context of the entire contract[,]" attempting to "avoid any term being rendered superfluous." *Id.* "Courts should not assume an overly paternalistic attitude toward the parties to a contract by relieving one or another of them of the consequences of what is at worst a bad bargain[.]" *Nelson v. Rice*, 12 P.3d 238, 243 (Ariz. Ct. App. 2000).

Applying these principles, the Court concludes that the Agreement does not require Wilson to pay Independence's outstanding Removal Costs. The Agreement is structured as a sale of Assets, rather than as a services contract. Wilson was not purchasing Independence's removal services; it was selling the Assets to Independence. Paragraph 4 of the Agreement states that Independence shall pay Wilson a "Purchase Price" for the Assets. As ordinarily understood, a purchase price is not a negative number; Wilson cannot be paid a negative dollar amount. The Agreement does not indicate that the parties intended "Purchase Price" to have a special meaning, nor does it state that Wilson will pay anything to Independence. Further, Paragraph 8 of the Agreement states that each party bears its own costs and expenses. If the Agreement intended for Wilson to pay the outstanding Removal Costs if they exceeded the gross proceeds from the sale of the Assets, it could have said so.

Independence argues that extrinsic evidence supports its reading of the Agreement, but extrinsic evidence is admissible only if "the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent[.]" *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993). Here, the Agreement places on Independence the risk of and responsibility for the Removal Costs. Paragraph 14 of the Agreement also states that the Agreement "constitutes the entire agreement between the Parties and supersedes all prior oral or written understanding and agreements." (Doc. 1 at 13.) Thus, Independence cannot rely on extrinsic evidence to support its counterintuitive interpretation.

Regardless, the extrinsic evidence Independence cites only reinforces the ordinary meaning of the Agreement. First, Independence references a declaration from Scott Laird, Independence's Business Development/Project Manager who oversaw the removal of the Assets from the Facility. (Doc. 26 at 13.) Mr. Laird states that he told Wilson's president, John Kling, that "Independence's Removal Costs *must be paid from the sales of the Assets* before Independence made any payment to . . . Wilson." (*Id.* (emphasis added).) Mr. Laird did not say that the Removal Costs must be paid out of Wilson's pocket in the event the gross proceeds from the sale of the Assets did not cover all the Removal Costs.

Second, Independence references an internal Independence email sent by Leo Slansky, the Senior Project Manager for Independence who signed the Agreement. (*Id.*) Mr. Slansky's email states that Independence would make a "net proceeds payment" to Wilson. (*Id.*) Again, this evidence says nothing about Wilson making any payments to Independence. It simply implies that if Removal Costs exceed gross proceeds, there will be no net proceeds for Independence to pay to Wilson.

Third, Independence references an internal Wilson email sent by Jonathan Reich, Wilson's Co-CEO, to Mr. Kling. (*Id.*) In response to Mr. Reich's question regarding whether Wilson could receive an up-front payment for the Assets, Mr. Kling responded that Independence "won't pay an upfront check" because "[t]here is a cost that they have to cover to demo and get the scrap." (*Id.*) Yet again, this email says nothing about Wilson bearing the risk that costs would exceed gross proceeds. This evidence merely reinforces what the Agreement plainly provides—the Removal Costs must be paid out of the gross proceeds before Wilson could receive the net proceeds (if any) as the Purchase Price.[6]

In sum, the Agreement plainly places responsibility for the Removal Costs on Independence, not Wilson. Although Independence is entitled to recoup its Removal Costs from the gross proceeds from the Assets' sale before paying the net proceeds to Wilson as a Purchase Price, it does not follow that if Removal Costs exceed gross proceeds, Wilson must reimburse Independence the difference. Such an interpretation is inconsistent with

---

[6] Notably, Wilson agrees that the "sales revenue was first to be used to pay Independence's removal costs, then to pay Wilson the Purchase Price." (Doc. 27 at 4.)

- 6 -

the plain language and structure of the Agreement. Wilson therefore is entitled to summary judgment on Count I of Independence's complaint.

### B. Unjust Enrichment

"Unjust enrichment occurs when one party has and retains money or benefits that in justice and equity belong to another." *Trustmark Ins. Co. v. Bank One, Ariz., NA*, 48 P.3d 485, 491 (Ariz. Ct. App. 2002). However, "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." *Brooks v. Valley Nat'l Bank*, 548 P.2d 1166, 1171 (Ariz. 1976). Such is the case here—Independence's unjust enrichment claim fails because the Agreement governs the relationship of the parties.

In arguing otherwise, Independence relies on *Adelman v. Christy*, 90 F. Supp. 2d 1034, 1045 (D. Ariz. 2000), in which the court concluded that the plaintiff's unjust enrichment claim could proceed alongside a breach of contract claim, but that the plaintiff could not collect a double recovery. The court explained that "[t]he language in *Brooks* . . . often cited by Arizona courts, is misleadingly overbroad," and that "[a] theory of unjust enrichment is unavailable only to a plaintiff if that plaintiff has already received the benefit of her contractual bargain." *Id.* The court reasoned that allowing both claims to proceed was appropriate in case the contract between the parties was found to be invalid or if the plaintiff was deemed the breaching party. *Id.* at 1045, n.10.

In *Trustmark*, however, the Arizona Court of Appeals distinguished *Adelman* and reinforced *Brooks*. Unlike the plaintiff in *Adelman*, the plaintiff in *Trustmark* did not "pursue its unjust enrichment claim in the alternative; rather, it [sought] to avoid possible contractual limitations on its recovery by resorting to an unjust enrichment" claim. *Trustmark*, 48 P.3d at 493. The court concluded that "*Brooks* is more on point here than *Adelman* and is controlling." *Id.* Likewise, *Trustmark* is more on point here because the validity and enforceability of the Agreement is unquestioned. S*ee In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 333-34 (S.D.N.Y. 2018) (distinguishing *Adelman* and following *Trustmark* to conclude that in Arizona, unjust enrichment may be

pled in the alternative to breach of contract when the validity or enforceability of a contract is in question). As explained above, the Agreement unambiguously places responsibility for the Removal Costs on Independence. As in *Trustmark*, to allow Independence to pursue an unjust enrichment claim under these circumstances would permit it to avoid those contractual limitations.[7] Accordingly, Wilson is entitled to summary judgment on Count III of Independence's complaint.

**IT IS ORDERED** that the Wilson's motion for partial summary judgement (Doc. 25) is **GRANTED**. Summary judgment is granted for Wilson and against Independence on Counts I and III of the complaint.

Dated this 27th day of July, 2020.

Douglas L. Rayes
United States District Judge

---

[7] Independence also relies on *Pio v. Uneka Concepts, Inc.*, No. CV 09-1443-PHX-SRB, 2010 WL 11515524, at *8 (D. Ariz. Jan. 12, 2010). (Doc. 26 at 15.) In *Pio*, the court denied a motion to dismiss the plaintiff's unjust enrichment claim, finding that *Adelman* was controlling. 2010 WL 11515524, at *8. The court explained that the "Defendants' reliance on *Trustmark* is misplaced" because unlike the plaintiff in *Trustmark*, who pursued only an unjust enrichment claim, the plaintiff in *Pio* "is pursuing his unjust enrichment claim as an alternative theory of recovery." *Id.* *Pio* is not on point here because, in light of the Court's decision on Count I, Independence's unjust enrichment claim would do nothing more than allow it to avoid application of the Agreement. Moreover, *Pio* involved the denial of a motion to dismiss. A contract's validity or enforceability may be less clear at such an early stage. It therefore is more common to allow contract and unjust enrichment claims to both proceed past the motion to dismiss stage.

- 8 -